# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 10, 2025

Lyle W. Cayce
Clerk

No. 24-10755

JUANITA RAMIREZ, *Personally* and *as the Personal Representative of* THE ESTATE OF ESTEVAN RAMIREZ,

*Plaintiff—Appellant,*

*versus*

JONATHAN GRANADO,

*Defendant—Appellee.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:22-CV-930

Before DENNIS, OLDHAM, and DOUGLAS, *Circuit Judges.*

PER CURIAM:[*]

Plaintiff-Appellant Juanita Ramirez brought an excessive-force claim against Lake Worth Police Department ("LWPD") Officer Jonathan Granado after he shot and killed her son, Estevan Ramirez, as he fled from

---

[*] At the request of our dissenting colleague, this opinion is designated for publication. *See* 5TH CIR. R. 47.5.2 ("An opinion will be published unless each member of the panel deciding the case determines that its publication is neither required nor justified under the criteria for publication."). The panel majority would decline to publish.

No. 24-10755

pursuing officers. The district court granted summary judgment to Officer Granado, concluding his use of deadly force was reasonable and, as a result, that qualified immunity shielded his actions from suit and liability. For the reasons that follow, we REVERSE and REMAND for further proceedings.

I

On September 3, 2021, at approximately 2:06 AM, Officer Granado, on duty in his marked police vehicle, heard fellow LWPD Officer R. Watson report over the police radio that he was engaged in a high-speed pursuit of a white Volkswagen Jetta whose driver failed to yield to a traffic stop for speeding. Officer Granado responded by joining the pursuit as a backup unit. At Officer Watson's request, LWPD dispatch ran the suspect vehicle's license plate and informed both officers that the fleeing vehicle was "not stolen" but that it previously evaded pursuit by a different police agency and that the "occupants are considered armed and dangerous." Importantly, however, and contrary to Officer Granado's later assertions, the transcripts of the dispatch and radio communications contain no indication that either officer received information suggesting that the vehicle or its occupants were involved in any "drive-by shootings."[1]

At 2:18 AM, Officer Granado located the ongoing pursuit and began following Officer Watson as the secondary chase unit. A few minutes later, the suspect vehicle made a sharp turn, struck a curb, and sustained significant damage. The suspect vehicle continued on for a short distance before coming to a stop at 2:22 AM. Officer Watson stopped his patrol car near the disabled vehicle. When the suspect vehicle came to a stop, four unidentified

---

[1] To the extent Officer Granado's allegations are disputed by Plaintiff-Appellant, we must view the evidence in the light most favorable to Plaintiff-Appellant and draw all factual inferences in her favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

No. 24-10755

individuals (including Ramirez) exited and fled in different directions. Officer Watson, who had also exited his patrol car, observed Ramirez emerging from the rear-left passenger door of the suspect vehicle. As Ramirez emerged from the vehicle, he held a handgun in his left hand and a cell phone in his right, though it is disputed when law enforcement learned that fact. After taking only a few steps, Ramirez dropped the cell phone and briefly paused to retrieve it. Officer Watson saw Ramirez "trying to flee" but "did not see a gun" at that point.

The following events unfolded over the span of approximately eight seconds. As Officer Watson approached Ramirez from the opposite side of his police cruiser, he "touched" or "grabbed" Ramirez and, for the first time, saw that Ramirez was holding a handgun "in a downward motion." Upon observing the handgun, Officer Watson "pushed off of" or "back[ed] away" from Ramirez to create distance as he attempted to unholster his own weapon. At the same time, Officer Granado stopped his patrol car to the right of Officer Watson's, exited it while drawing his service weapon, and shouted "he's got a gun, he's got a gun!" Officer Granado fired a single shot in the direction of Officer Watson and Ramirez—a shot that Officer Watson later recalled passed "right by [him]." Ramirez then "r[an] away" from Officer Watson "in a southwest direction" and "continued to flee away from him across the street" and into a nearby intersection.

The officers' accounts diverge as to what happened next. Officer Granado later claimed that Ramirez "was swinging his pistol in the direction of Officer Watson and [him]" as he fled. Officer Watson, however, stated that "Ramirez never pointed the gun toward me or while he was running away[.]" As Ramirez continued to flee from the officers, Officer Granado fired his service weapon at Ramirez six more times without warning. Four of his bullets struck the back of Ramirez's head and shoulders. Ramirez collapsed face-first on the street in the direction he had been running. Officer

No. 24-10755

Watson, who had attempted to unholster his weapon, never "cleared leather" before the gunfire ended. Seconds later, Officer Granado asked Officer Watson, "did he have a gun?" Ramirez died at the scene.

Plaintiff-Appellant Juanita Ramirez, individually and on behalf of Estevan Ramirez's estate, brought an excessive-force claim against Officer Granado under 42 U.S.C. § 1983. Officer Granado moved for summary judgment on the basis of qualified immunity. The district court granted Officer Granado's motion, concluding his use of deadly force was objectively reasonable under the circumstances and, as a result, he was entitled to qualified immunity. The district court entered final judgment dismissing Plaintiff-Appellant's suit with prejudice. This timely appeal followed.

## II

We review a district court's grant of summary judgment based on qualified immunity de novo. *Crane v. City of Arlington, Tex.*, 50 F.4th 453, 461 (5th Cir. 2022) (citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 405 (5th Cir. 2021)). "When a defendant official moves for summary judgment on the basis of qualified immunity, 'the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law.'" *Id.* (quoting *Aguirre*, 995 F.3d at 406). "All facts must be viewed in the light most favorable to the nonmovant and all justifiable inferences must be drawn in his favor." *Id.* (citing *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018)).

## III

We conclude Plaintiff-Appellant has established genuine disputes of material fact that preclude the grant of summary judgment on qualified immunity.

No. 24-10755

## A

Whether an officer is entitled to qualified immunity involves two inquiries: (1) "whether the officer's conduct violated a federal right," and (2) "whether that right was clearly established at the time of the violation." *Id.* at 463 (citing *Tolan*, 572 U.S. at 655–56). "Under the first step, to state a violation of the Fourth Amendment prohibition on excessive force," the plaintiff must show: "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force that was objectively unreasonable." *Bush v. Strain*, 513 F.3d 492, 500–01 (5th Cir. 2008).

"[T]he 'reasonableness' inquiry . . . is an objective one," *Graham v. Connor*, 490 U.S. 386, 397 (1989), and "requires analyzing the 'totality of the circumstances.'" *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (quoting *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 427–28 (2017)). While objective reasonableness is "not capable of a precise definition or mechanical application," the Supreme Court in *Graham v. Connor* outlined a few considerations that inform the need for force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

Importantly, the "threat-of-harm factor typically predominates the analysis when deadly force has been deployed[.]" *See Crane*, 50 F.4th at 463.[2]

---

[2] On the first *Graham* factor—the severity of the crime at issue—Officer Granado contends that Ramirez was involved in a high-speed pursuit, had been identified by dispatch as "armed and dangerous," and resisted arrest while armed with a handgun. It is undisputed that LWPD dispatch informed both officers that the suspect vehicle had previously fled from police and that its occupants should be considered "armed and dangerous." But nothing in the record suggests that Ramirez was individually suspected of

No. 24-10755

Officer Granado asserts that, when he stopped his police cruiser, he "saw that [Ramirez] had a pistol in his hand," and "believed [Ramirez] was going to shoot and kill Officer Watson and [him]." It is undisputed Officer Granado observed Ramirez move toward Officer Watson, who briefly made physical contact with Ramirez in what Officer Watson later described as a fleeting altercation. But this speaks to the *first* unsuccessful shot Officer Granado fired in the direction of Ramirez. Officer Granado admits that, after this first shot, he "stopped firing so as not to hit Officer Watson [who] was momentarily between me and [Ramirez]."

The issue here, then, is whether a genuine dispute of material fact exists as to whether Ramirez continued to pose an immediate threat to the officers or others when Officer Granado fired six *more* rounds as Ramirez ran away down the street without warning. *See Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) (reversing grant of summary judgment on qualified immunity after distinguishing between initial and subsequent shots in excessive force analysis); *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021). After all, "an exercise of force that is reasonable at one

---

criminal conduct before the stop. Officer Granado observed Ramirez exit from the rear-left passenger door of the suspect vehicle, demonstrating that he was not the driver and therefore not responsible for the high-speed pursuit. *See* Tex. Transp. Code § 545.421(a). Moreover, the characterization of the occupants as "armed and dangerous" is not itself indicative of any criminal offense and bears more directly on the second *Graham* factor—whether the suspect poses an immediate threat—rather than the severity of any crime. *See Smith v. Lee*, 73 F.4th 376, 385 (5th Cir. 2023). The only offense Officer Granado could reasonably attribute to Ramirez based on his observations was evading arrest on foot, which is relevant to the third *Graham* factor. Evading arrest, however, cannot alone justify the use of deadly force absent an objectively reasonable belief that the suspect poses an immediate threat of serious harm to officers or others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). Accordingly, our analysis turns primarily to the second *Graham* factor, which we recognize as the predominant factor in this inquiry. *See Crane*, 50 F.4th at 463.

No. 24-10755

moment can become unreasonable in the next if the justification for the use of force has ceased." *Id.* (quoting *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009)); *Barnes*, 145 S. Ct. at 1358 ("[T]he situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review."). Although Officer Granado does not dispute that Ramirez was fleeing at the time of the subsequent shots, he seeks to justify his continued use of deadly force by claiming that Ramirez "was swinging his pistol in the direction of Officer Watson and [him]" as he ran.

That justification turns on two disputed material facts: (1) whether Officer Granado perceived that Ramirez was armed with a handgun, and (2) whether Ramirez, while fleeing, swung that handgun in the officers' direction. As to the first, Officer Granado was generally aware that police dispatch had advised that the suspects in the vehicle should be considered "armed and dangerous." And as Officer Granado exited his patrol car "with adrenaline pumping, lights flashing, confusion of the scene, the fog of danger, and fog of night,"[3] he claims that he "saw that [Ramirez] had a pistol in his hand," prompting him to shout: "he's got a gun, he's got a gun!" Officer Watson—who was standing next to Ramirez—first noticed Ramirez holding a handgun at that same moment. Yet, viewing the evidence in the light most favorable to Plaintiff–Appellant, Officer Granado's own words immediately after the shooting cast doubt on his asserted perception. Moments after firing the fatal shots, he turned to Officer Watson and asked: "did he have a gun?"[4]

---

[3] *See* Oral Arg. 22:38–22:44.

[4] Officer Granado claims he made this statement merely "to confirm that what he perceived was accurate . . . ." The sincerity of this explanation is not one that we may resolve on summary judgment. *See Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) ("Summary judgment is not appropriate when 'questions about the credibility of key witnesses loom . . . large' and the evidence could permit the trier-of-fact to treat their

No. 24-10755

A reasonable jury could find that this contemporaneous question sufficiently disputes Officer Granado's claim that he saw Ramirez armed before and during the shooting.

Next, contradictory evidence undermines Officer Granado's claim that Ramirez threatened the officers or swung anything in their direction as he fled. First, Officer Granado's own body-camera footage does not depict Ramirez "swinging his pistol in the direction" of either officer. Second, Officer Watson, who was closest to Ramirez, unequivocally stated that "Ramirez never pointed the gun toward me or while he was running away[.]" Third, the findings of Ramirez's autopsy are inconsistent with Officer Granado's account. The medical examiner concluded that each of the four bullets that struck Ramirez—including the fatal shot to the *back* of his head—traveled through his body from "back to front."[5] The trajectories of these

---

testimony with 'skeptical scrutiny.'" (quoting *Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 331 (5th Cir. 2000))). In any event, we must view the summary judgment evidence in the light most favorable to Plaintiff-Appellant and draw all reasonable inferences in her favor. *Darden*, 880 F.3d at 727. Accepting Officer Granado's explanation as true at this juncture would turn that standard on its head.

[5] Officer Granado argues that Ramirez's autopsy report "actually indicates wounds in the rear right side [of his head], which is consistent with the video evidence and with Officer Granado's perception that Ramirez would have been swinging the gun toward him and Officer Watson." He cites to an investigative report by the Fort Worth Police Department ("FWPD") that describes the head-wound's trajectory as "right to left." That same report, however, notes "[a]n entrance gunshot wound to the back of the head on the right side, behind the ear[.]" The autopsy report likewise describes the path of that bullet as traveling from "right to left, back to front[.]" Viewing the evidence in the light most favorable to Plaintiff-Appellant, that Ramirez was shot in the rear right side of his head and body is consistent with the summary judgment evidence that he fled in a southwest direction—and it is not undisputed fact that Ramirez had swung his handgun in the direction of Officers Watson and Granado. Indeed, the autopsy report tends to show that Ramirez did not turn toward the officers as he ran down the street. Had he done so, it is unlikely that he would have been shot in the back of his head and shoulders by Officer Granado.

No. 24-10755

bullets contradict the claim that Ramirez turned his torso, head, or weapon toward the officers as he fled. *See Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) ("The nature of the wounds indicate that [the suspect], was not facing [the officer] when he was shot . . . rais[ing] a serious question as to the reasonableness of his conduct, more of a question of fact than a court may dispose of on summary judgment.").

In response, Officer Granado relies on the general principle that an officer need not wait "until a defendant turns towards them, with weapon in hand, before applying deadly force to ensure their safety." *See, e.g.*, *Salazar-Limon v. City of Hous.*, 826 F.3d 272, 279 n.6 (5th Cir. 2016), *as revised* (June 16, 2016). But this principle applies to cases in which a suspect reaches into areas where a gun could be hidden out of an officer's line of sight or makes other types of furtive gestures such as suddenly reaching into their waistband. *See, e.g.*, *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 385 (5th Cir. 2009); *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991); *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1352–53 (5th Cir. 1985). Here, Officer Granado never lost sight of Ramirez as he fled, and it is firmly disputed whether Ramirez made any threatening gestures that reasonably evince a risk to officers or others, or that Officer Granado knew Ramirez was armed at all.[6]

At bottom, Plaintiff-Appellant and Officer Granado offer genuinely conflicting narratives as to what occurred and what was perceived on the night of September 3, 2021. The accuracy of these competing narratives is

---

[6] Officer Granado disputes Plaintiff-Appellant's contention that Ramirez was "simply attempting to flee." Officer Granado argues that Ramirez "pick[ed] up his gun after having dropped it," which "is fundamentally inconsistent with 'simply fleeing' the scene." But the FWPD investigative report disputes that Ramirez ever dropped his handgun: "[Ramirez] emerged [from the suspect vehicle] holding a black handgun . . . in his left hand and a cell phone in his right hand," and "[a]fter just a few steps, he *dropped the cell phone* and stopped to pick it up."

precisely the kind of question that cannot be resolved at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"). And "[o]f course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official." *Saucier v. Katz*, 533 U.S. 194, 216 (2001) (Ginsburg, J., concurring). "[I]t will be for a jury, and not judges, to resolve the[se] competing factual narratives . . . as to [Plaintiff-Appellant's] excessive-force claim." *Cole v. Carson*, 935 F.3d 444, 447 (5th Cir. 2019) (en banc), *as revised* (Aug. 21, 2019). Plaintiff-Appellant has established genuine disputes of material fact regarding whether Officer Granado unreasonably employed deadly force against Ramirez in violation of the Fourth Amendment.

## B

The remaining issue is whether Plaintiff-Appellant's version of the disputed facts constitutes a violation of clearly established law. As we explained in *Lytle*, "[i]t has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." 560 F.3d at 417; *see also Baker*, 75 F.3d at 198. Under Plaintiff-Appellant's version of the disputed facts, Officer Granado did not know Ramirez was armed, observed Ramirez flee from the officers with his back turned, and never saw Ramirez turn toward the officers during his flight. His use of deadly force in this context violates the Fourth Amendment under clearly established law.

No. 24-10755

## IV

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings not inconsistent with this opinion.

No. 24-10755

James L. Dennis, *Circuit Judge*, concurring:

I concur in the majority opinion without reservation. I write separately to address the dissent. Despite its protestations that the majority is wrong to hold that a jury, not judges, must resolve the genuine disputes of material fact here, the dissent ignores the abundant evidence establishing those disputes. And the authority it musters? A mile-wide string of citations, with scarcely an inch deep of relevance. The dissent's error thus runs on two tracks: (A) disregarding or resolving factual disputes that belong to a jury, and (B) wrenching caselaw so far from its moorings as to strip it of all meaning.

A

At summary judgment, the question is not whether a judge can craft a tidy narrative from selected fragments of the record; it is whether a reasonable jury, crediting the nonmovant's evidence and drawing all reasonable inferences in her favor, could find for her. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The dissent's account falters on three fronts: it (1) resolves competing inferences—a job that belongs to a jury; (2) treats assertions untethered to the record as undisputed fact; and (3) omits context that materially bears on objective reasonableness.

*First*, the dissent makes choices among competing inferences that a jury must resolve. The dissent says that "during the chase," Officer Granado learned that the vehicle's occupants "had been involved in drive-by shootings." *Post*, at 21. The first time this detail appears in the record is in Officer Granado's post-shooting written statement: "During the pursuit, I heard *Officer Watson state on the radio* that per White Settlement PD, the suspect vehicle had been involved in drive by shootings . . . ." ROA.554 (emphasis added). But the dispatch and radio transcripts in the record contain no such statement, nor do Officer Watson's report or recorded interview speak to such a critical detail. ROA.576–77; ROA.582; ROA.931

("Watson Interview") at 6:00–6:13; ROA.1013. Officer Watson pursued the vehicle only because of the driver's speeding violation. Whether Officers Watson or Granado had any information to suspect Ramirez, as a passenger, of a crime is a question for the jury at trial. The dissent also leans heavily on the compressed timeline, emphasizing that about eight seconds elapsed between Officer Granado's shout—"he's got a gun!"—and Officer Granado's final shot to Ramirez's back as he ran away. *Post*, at 23. But the fact that events unfolded quickly is not dispositive, for we must still view the evidence in the light most favorable to the plaintiff. *See Tolan v. Cotton*, 572 U.S. 650, 657–58 (2014) (per curiam). And here, immediately after Officer Granado's gunfire ceased, Officer Granado asked Officer Watson, "did he have a gun?" Granado Body Camera ("GBC") at 14:55–14:56. A jury could hear that unguarded question and disbelieve that Officer Granado actually saw Ramirez holding a gun before and while shooting him in the back.

The dissent also implicitly accepts as true Officer Granado's post-shooting justification for his use of deadly force: that, as Ramirez fled, he "was swinging his pistol in the direction of Officer Watson and [Officer Granado]." ROA.502 ¶¶ 14–17. The record disputes this. Officer Watson—the officer closest to Ramirez—flatly stated "Ramirez never pointed the gun toward me or while he was running away," and the video evidence does not depict Ramirez "swinging" or pointing his handgun toward either officer. ROA.594; ROA.529; GBC at 14:42–14:44. The autopsy likewise found that four bullets struck Ramirez and that each traveled through Ramirez's body from back to front, including a fatal shot to the back of his head. ROA.975–76, 979. Finally, the still image reproduced below—taken from Officer Granado's body-worn camera at the moment he began firing the fatal shots—shows both officers behind Ramirez. GBC at 14:42–14:44. At the left of the frame, Officer Watson stands with his service weapon still holstered. Officer Granado is to the right of and behind Officer Watson, and Ramirez is shown

fleeing with his back to both officers. This is the critical frame the dissent's cherry-picked selection omits:



*Second*, many of the dissent's assertions are unsupported by the record. For example, the dissent's suggestion that Ramirez fled "with his finger on the trigger," *post*, at 22, finds no footing in the record. Neither investigative nor police reports make this claim, and the videos do not support it; they show only that Ramirez held a handgun in his left hand. ROA.524; ROA.554; ROA.588; ROA.885; GBC at 14:42–14:44.

*Third*, the dissent omits context that materially bears on reasonableness. The dissent says Ramirez was "involved in a high-speed, 120-mph car chase," *post*, at 21, but that invites the impression that Ramirez was the driver who precipitated the pursuit. He was not. Ramirez was a passenger who exited from the suspect vehicle's rear-left passenger door. Watson Dash Camera–Wide ("WDCW") at 16:16–16:20; Watson Interview at 10:40–10:50. And before the stop, nothing in the record indicates Ramirez himself was suspected of any specific crime. The dissent also notes that the chase ended in a "residential neighborhood," *post*, at 21, but the intersection

where the shooting occurred—Horne Street and Houghton Avenue—was bordered by a gas station, a commercial building, a vacant lot, and one residence. The gas station and residence were located behind both officers and opposite the direction of Ramirez's flight and Officer Granado's shots. The environment the officers actually faced, and the direction Ramirez was running—with his back turned—is less developed, context jurors may weigh in assessing objective reasonableness of Officer Granado's use of deadly force. *See* GBC at 14:35–14:44.

The dissent's excerpted narrative, then, rests on disputed facts and omitted context that a jury could find decisive. We may not declare which story is true. Instead, we enforce the principle that when "an excessive force claim turns on which of two conflicting stories best captures what happened on the street," we will not "permit summary judgment in favor of the defendant official." *Saucier v. Katz*, 533 U.S. 194, 216 (2001) (Ginsburg, J., concurring). Applying that teaching here, the majority rightly reverses.

### B

That leaves the dissent's citations, which serve as a reminder that one can stack citations to the ceiling, but a tower of distinguishable cases is still no foundation. All of the dissent's citations fall into two categories not relevant here: first, cases involving deadly force in response to a suspect's overt threatening acts directed at officers; and second, cases where deadly force followed a suspect's sudden furtive reach toward a hidden area outside of the officer's line of sight that reasonably suggested the suspect was retrieving a weapon.

Unlike the present dispute, most of the cases the dissent invokes turn on overt threatening acts by suspects directed toward officers prior to their use of deadly force, *e.g.*, raising a hammer as if to throw it at officers (*City of Tahlequah*), advancing toward officers while holding a knife (*Kisela*; *Sheehan*;

No. 24-10755

*Dimock*), pointing firearms at officers during standoffs (*White*; *Maser*; *Arnold*), setting a house ablaze with officers inside and charging at them with a club (*Waterhouse*), threatening officers with an axe or machete (*Shaw*; *Flores*), or a refusal to disarm despite explicit commands to do so by officers (*Garcia*; *Boyd*).[1] Others emphasize similar conduct where the suspect

---

[1] *City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 11 (2021) (per curiam) ("[The suspect] grasped the handle of the hammer with both hands, as if preparing to swing a baseball bat, and pulled it up to shoulder level. . . . He then raised the hammer higher back behind his head and took a stance as if he was about to throw the hammer or charge at the officers."); *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (per curiam) (suspect holding a large knife "moved to within a few feet of [the officer]; and she failed to acknowledge at least two commands to drop the knife"); *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 605–06 (2015) (armed mentally ill suspect, who "had just threatened to kill" the officers, twice confronted officers with a knife; after retreat failed and pepper spray was ineffective, she charged again and was shot); *Dimock, Tr. for Heirs of Dimock-Heisler v. City of Brooklyn Ctr.*, 124 F.4th 544, 549 (8th Cir. 2024) (suspect who had threatened individual with a knife and hammer resisting arrest, grabbed knife, and ran toward officer); *White v. Pauly*, 580 U.S. 73, 76 (2017) (per curiam) ("[One suspect] stepped part way out of the back door and fired two shotgun blasts while screaming loudly. A few seconds after those shots, [another suspect] opened the front window and pointed a handgun in Officer White's direction."); *Maser v. City of Coralville*, 139 F.4th 1004, 1006–07 (8th Cir. 2025) (barricaded suspect who had "threaten[ed] to commit suicide, had shot a hole through the ceiling of his house that morning, was on a three-day long drinking binge," emerged from his garage holding a gun and "raised [it] in an extended position away from his body at about chest level," and officers "perceived [the suspect] was pointing the rifle toward other officers at this moment"); *Arnold v. City of Olathe*, 35 F.4th 778, 787 (10th Cir. 2022) ("Howard was waiving a .45 caliber handgun in the general direction of the officers. . . . [S]he pointed the gun toward the officers with her finger on the trigger . . . ."); *Waterhouse v. Direzza*, 129 F.4th 1212, 1221–25 (10th Cir. 2025) (use of deadly force reasonable where a "destructive and violent" barricaded suspect refused to surrender for two hours, then "lit the house on fire while officers were inside" and rushed toward officers with a club); *Shaw v. City of Selma*, 884 F.3d 1093, 1097–98 (11th Cir. 2018) (mentally ill suspect armed with an axe shot by officer after he "turned, and began moving slowly towards" the officer and after failing to comply with twenty-six separate commands to drop the axe); *Flores v. Henderson*, 101 F.4th 1185, 1192 (10th Cir. 2024) ("Within seconds, [the suspect] rushed from the bedroom and moved toward the officers with a machete in hand."); *Garcia v. Blevins*, 957 F.3d 596, 599 (5th Cir. 2020); *Boyd v. Baeppler*, 215 F.3d 594, 598 (6th Cir. 2000) ("[A]n armed man who had reportedly fired shots, potentially endangering others in the area . . . did not stop, as ordered, nor did he drop the gun which had been observed in his hand by a

possessed harmless replicas of weapons the officers believed were real (*Strickland*; *Napouk*).[2] Those cases stand for a narrow and unremarkable proposition that when a suspect aims a weapon at officers or closes distance while brandishing it despite repeated commands to disarm, the Fourth Amendment ordinarily does not prohibit deadly force. The dissent attempts to apply that principle to this very different factual record that lacks the predicates driving those outcomes. Under Plaintiff-Appellant's view of the disputed facts, Ramirez never pointed his weapon at either officer, was actively fleeing with his back turned away from the officers when he was slain, and the record reflects that neither officer commanded Ramirez to stop or disarm.

Another large tranche of the dissent's laundry list rests on the "furtive reach" paradigm where a suspect refuses commands, makes overt threats, or moves toward officers while suddenly reaching or moving toward a hidden area outside of the officer's line of sight, *e.g.*, waistband (*Salazar-Limon*; *Batyukova*; *Argueta*; *Taylor*), vehicle floorboard (*Young*; *Reese*), or console (*Manis*; *Benton*).[3] Variants involve sudden gestures made by suspects

---

disinterested witness and by four different police officers at close range.").

[2] *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 618, 623 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 559 (2024) (use of deadly force reasonable where a mentally ill suspect, armed with a plastic replica gun mistaken by officers as a real gun, "lowered the barrel toward" the officers); *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 913–16 (9th Cir. 2024) (use of deadly force reasonable where suspect repeatedly refused commands to disarm and advanced towards officers while armed with a "toy sword wrapped in duct tape" that objectively looked like a machete to officers).

[3] *Salazar-Limon v. City of Houston*, 826 F.3d 272, 275 (5th Cir. 2016), *as revised* (June 16, 2016) (resisted arrest and failed to comply with commands); *Batyukova v. Doege*, 994 F.3d 717, 723 (5th Cir. 2021) (suspect shouted to officer "you're going to f**king die tonight"); *Argueta v. Jaradi*, 86 F.4th 1084, 1092 (5th Cir. 2023) ("Argueta's clutching his right arm to his side as he fled police confrontation was a furtive gesture akin to reaching for a waistband."); *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 750 (10th Cir. 2021) (suspect explicitly mimicked drawing a weapon from his waistband); *Alcala v. Ortega*, 128

following shoot-outs or armed standoffs (*Franklin*; *Harris*).[4] Those decisions are animated by an officer's momentary loss of visual contact with the suspect's hands, and the movement reasonably suggested the suspect was retrieving a weapon, particularly where suspects had already demonstrated deadly intent. That is why those opinions repeatedly speak in terms of "split-second" judgments about concealed threats. Again, not our facts in the present case. Officer Granado's use of deadly force against Ramirez—who never pointed, brandished,[5] or fired his weapon—occurred during Ramirez's flight as a wide-open target across a broad street and intersection without warning. Neither officer lost sight of Ramirez, the body-camera shows no sudden reach, and the back-to-front wound paths through Ramirez's body are inconsistent with him having turned-and-aimed. Importing furtive-reach

---

F.4th 1298, 1308 (10th Cir. 2025) (same); *Young v. City of Killeen*, 775 F.2d 1349, 1351 (5th Cir. 1985); *Reese v. Anderson*, 926 F.2d 494, 496 (5th Cir. 1991); *Manis v. Lawson*, 585 F.3d 839, 842 (5th Cir. 2009) (suspect ignored commands to show hands and was shot after "repeatedly reach[ing] underneath the front seat" and "appeared to retrieve some object and began to straighten up"); *Benton v. Layton*, 139 F.4th 281, 287 (4th Cir. 2025) (same).

[4] *Caraway v. City of Pineville*, 111 F.4th 369, 377 (4th Cir. 2024) (suspect "pointed his gun at the officers in the moments before the shooting"); *Franklin v. Popovich*, 111 F.4th 1188, 1192 (11th Cir. 2024) (suspect raised hands "as though he was aiming a gun" after having "exchanged gunfire with the police and possibly shot one of the officers"); *Harris-Billups ex rel. Harris v. Anderson*, 61 F.4th 1298, 1301 (11th Cir. 2023) (suspect shot after "open[ing] fire on the officers" and again after moving his arms towards his torso).

[5] For the same reason, *Wilson v. City of Bastrop*, 26 F.4th 709 (5th Cir. 2022), is inapposite. There, officers responded to reports of an armed confrontation at an apartment complex involving a specific vehicle. *Id.* at 711. A lone officer stopped that vehicle near an elementary school as a school bus and other bystanders were present. *Id.* at 711–12, 714. A passenger exited holding a semiautomatic pistol with an extended magazine, ignored repeated commands to drop the weapon, and ran toward the school, triggering a two-minute armed chase. *Id.* at 711–12. While fleeing, he pointed the gun back toward the pursuing officer and then ran toward another officer. *Id.* at 712. After shots caused the suspect to stumble and drop the weapon, he picked it up and continued toward a nearby neighborhood with onlookers, where officers again fired, killing him. *Id.* at 712, 714.

No. 24-10755

logic into these facts collapses a distinction those cases carefully preserve: unseen hand movements toward concealed areas versus continuous visual contact with a suspect intent only on running away.[6]

In the end, the dissent's mountain of citations cannot bear the weight it places on them. Most involve the plainest kind of immediate, overt threats to officers; the rest turn on concealed or furtive movements. None comes to grips with the facts a jury could find here. And when pressed on these gaps, the dissent shrugs and says that it need not cite any supporting precedent. *Post*, at 26–27. That speaks for itself.

\*     \*     \*

Contrary to the dissent's characterization, today's disposition merely recognizes that when the record contains genuine conflicts about what an officer actually *knew*[7] and what the suspect actually *did* in the seconds before the fatal shots—conflicts borne out by contemporaneous statements, investigative reports, video footage, and physical evidence—we may not

---

[6] The dissent's suggestion that "*actually holding a gun* while fleeing," *post*, at 27, is itself a furtive gesture justifying the use of deadly force finds no footing in our binding precedent. *See Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023) ("[A]n officer cannot escape liability any time he claims he saw a gun. The question is whether the officer's belief that he saw a gun was sufficiently reasonable to justify the use of deadly force in light of all the surrounding circumstances.").

[7] Objective reasonableness means that an officer's *subjective intent* does not matter; it does not mean that a court may ignore disputes over what the officer perceived or what information he possessed when he used deadly force. *See, e.g.*, *Garza v. Briones*, 943 F.3d 740, 745–46 (5th Cir. 2019). After all, "what matters is what [Officer Granado] knew when [he] shot [Ramirez]." *Cole v. Carson*, 935 F.3d 444, 456 (5th Cir. 2019) (en banc) (first citing *White*, 580 U.S. at 76–77; and then citing *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)), *as revised* (Aug. 21, 2019); *Kingsley*, 576 U.S. at 397 ("[W]e have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer.").

No. 24-10755

resolve them on summary judgment. That is not 20/20 hindsight. It is fidelity to the summary-judgment standard and to the jury's constitutional role. Accordingly, the majority opinion properly reverses the district court's grant of summary judgment to Officer Granado and remands under well-established principles.

No. 24-10755

Andrew S. Oldham, *Circuit Judge*, dissenting:

Here are the undisputed (and indisputable) facts that the majority ignores or incomprehensibly denies. All material facts are captured on video:

- Estevan Ramirez was involved in a high-speed, 120-mph car chase.
- During the chase, Defendant Officer Granado learned that the vehicle occupants had been involved in drive-by shootings, and that they were armed and dangerous.
- The high-speed chase ended in a residential neighborhood.
- Ramirez jumped out of the car ***holding a gun***.



No. 24-10755

- Ramirez's cell phone fell out of his hand, and he stooped to retrieve it *while maintaining his grip on the gun*.



- Officer Granado yelled "he has a gun! He has a gun!"
- Officer Granado's colleague was mere feet away from Ramirez when Ramirez held the gun with his finger on the trigger.



No. 24-10755

- Officer Granado shot Ramirez.
- From the moment Officer Granado emerged from his vehicle and shouted "he has a gun! He has a gun!" to the moment Officer Granado fired his service weapon, the entire episode was merely eight seconds.

The majority somehow holds that Officer Granado is not entitled to qualified immunity. If you've ever read one excessive-force case in the post-*Monroe v. Pape* era, you know that is wrong. *See, e.g.*, *City of Tahlequah v. Bond*, 595 U.S. 9, 11–14 (2021) (per curiam) (officers entitled to qualified immunity for shooting man holding a hammer); *Kisela v. Hughes*, 584 U.S. 100, 105–06 (2018) (per curiam) (officers entitled to qualified immunity for shooting woman holding a kitchen knife); *White v. Pauly*, 580 U.S. 73, 78 (2017) (per curiam) (officer entitled to qualified immunity for shooting man through window after man pointed a gun at an officer); *Hunter v. Cole*, 580 U.S. 994, 994 (2016) (order) (vacating Fifth Circuit opinion denying qualified immunity in which officer shot teenager who was holding a gun to his head); *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 605–06, 617 (2015) (officers entitled to qualified immunity for shooting a woman with a mental illness holding a kitchen knife); *Barnes v. Felix*, No. 22-20519, 2025 WL 2674139 (5th Cir. Sept. 18, 2025) (officer entitled to qualified immunity for shooting driver after jumping onto doorframe of driver's moving car); *Argueta v. Jaradi*, 86 F.4th 1084, 1087, 1094 (5th Cir. 2023) (officer entitled to qualified immunity for shooting man holding a gun), *cert. denied*, 145 S. Ct. 435 (2024); *Batyukova v. Doege*, 994 F.3d 717, 723, 729 (5th Cir. 2021) (officer entitled to qualified immunity for shooting *unarmed* suspect who walked toward officer and reached for waistband); *Garcia v. Blevins*, 957 F.3d 596, 602 (5th Cir. 2020) (officer entitled to qualified immunity for shooting man who refused to drop his gun); *Salazar-Limon v. City of Houston*, 826 F.3d 272, 275, 279 (5th Cir. 2016) (officer entitled to qualified immunity for shooting

*unarmed man* who allegedly made a furtive gesture toward his waistband); *Thomas v. Baldwin*, 595 F. App'x 378, 383 (5th Cir. 2014) (officer entitled to qualified immunity for shooting *unarmed* man who raised clenched hand as if holding a weapon); *Clayton v. Columbia Cas. Co.*, 547 F. App'x 645, 653 (5th Cir. 2013) (per curiam) (officer entitled to qualified immunity for shooting man holding a knife); *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009) (officer entitled to qualified immunity for shooting *unarmed man* who allegedly reached for something under the front seat of his vehicle); *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 384–85 (5th Cir. 2009) (officer entitled to qualified immunity for shooting *unarmed man* who allegedly reached for something inside a boot); *Ramirez v. Knoulton*, 542 F.3d 124, 130–31 (5th Cir. 2008) (officer entitled to qualified immunity where armed suicidal man's behavior while holding a handgun "could reasonably be interpreted as defiant and threatening"); *Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991) (officer entitled to qualified immunity for shooting *unarmed man* who made *no* furtive gestures and merely reached down to turn off ignition in vehicle); *Young v. City of Killeen*, 775 F.2d 1349, 1351–53 (5th Cir. 1985) (officer entitled to qualified immunity for shooting *unarmed man* who allegedly reached toward floorboard of his vehicle); *Bannon v. Godin*, 99 F.4th 63, 85–86 (1st Cir. 2024) (officers entitled to qualified immunity where suspect reached for gun in passenger seat following high-speed chase), *cert. denied*, 145 S. Ct. 1048 (2025), *reh'g denied*, 145 S. Ct. 1347 (2025); *Benton v. Layton*, 139 F.4th 281, 288–92 (4th Cir. 2025) (officers entitled to qualified immunity where driver reached for gun after high-speed chase); *Caraway v. City of Pineville*, 111 F.4th 369, 383–84 (4th Cir. 2024) (officers entitled to qualified immunity where suspect reached for gun in his jacket pocket); *Boyd v. Baeppler*, 215 F.3d 594, 601–02 (6th Cir. 2000) (officer entitled to qualified immunity where suspect fled holding a pistol and disregarded police warnings to stop); *Klum v. City of Davenport*, 145 F.4th 907, 912–13 (8th Cir.

2025) (officer entitled to qualified immunity where suspect fled with a gun to his own head and disregarded officers' commands to stop); *Dimock ex rel. Dimock-Heisler v. City of Brooklyn Ctr.*, 124 F.4th 544, 553–55 (8th Cir. 2024) (officers entitled to qualified immunity for shooting suspect holding a knife); *Arnold v. McClinton*, 112 F.4th 598, 604 (8th Cir. 2024) (officer entitled to qualified immunity for shooting fleeing murder suspect); *Goffin v. Ashcraft*, 977 F.3d 687, 689 (8th Cir. 2020) (officer entitled to qualified immunity for shooting fleeing suspect even though pat-down revealed no weapons); *Kong ex rel. Kong v. City of Burnsville*, 960 F.3d 985, 990–93 (8th Cir. 2020) (officers entitled to qualified immunity for firing 23 shots at man holding a knife); *Napouk v. L.V. Metro. Police Dep't*, 123 F.4th 906, 914, 922–23 (9th Cir. 2024) (officers entitled to qualified immunity after shooting suspect holding a toy that resembled a knife); *Cruz v. City of Deming*, 138 F.4th 1257, 1264, 1271–72 (10th Cir. 2025) (officers entitled to qualified immunity when armed man began to point gun toward officers); *Alcala v. Ortega*, 128 F.4th 1298, 1303–04, 1313 (10th Cir. 2025) (officer entitled to qualified immunity where *unarmed man* pretended to brandish a gun); *Waterhouse v. Direzza*, 129 F.4th 1212, 1219, 1222–25 (10th Cir. 2025) (officer entitled to qualified immunity for shooting suspect he believed was armed with a club); *Flores v. Henderson*, 101 F.4th 1185, 1190, 1197–99 (10th Cir. 2024) (officer entitled to qualified immunity for shooting suspect armed with a machete); *Arnold v. City of Olathe*, 35 F.4th 778, 792–94 (10th Cir. 2022) (officers entitled to qualified immunity where armed suspect suddenly brandished gun toward officers after hours-long standoff); *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 775–77 (10th Cir. 2021) (officer entitled to qualified immunity where *unarmed man* pretended to draw firearm from waistband); *Franklin v. Popovich*, 111 F.4th 1188, 1196–97 (11th Cir. 2024) (officer entitled to qualified immunity for shooting *unarmed and prone* suspect who moved as if to draw a gun); *Harris-Billups ex rel. Harris v. Anderson*, 61 F.4th 1298, 1305 (11th Cir.

No. 24-10755

2023) (officer entitled to qualified immunity for shooting prone suspect who reached for gun after fleeing from officers); *Powell v. Snook*, 25 F.4th 912, 923–25 (11th Cir. 2022) (officer entitled to qualified immunity where innocent homeowner began to raise handgun after officers arrived at the wrong house); *Shaw v. City of Selma*, 884 F.3d 1093, 1097–1101 (11th Cir. 2018) (officer entitled to qualified immunity for shooting man holding an axe); *Montoute v. Carr,* 114 F.3d 181, 185–86 (11th Cir. 1997) (officer entitled to qualified immunity for shooting suspect when suspect fled with a sawed-off shotgun and ignored command to stop); *cf. Wilson v. City of Bastrop*, 26 F.4th 709, 711–13 (5th Cir. 2022) (officers did not violate Fourth Amendment by shooting man holding a gun who fled from police in a residential area); *Maser v. City of Coralville*, 139 F.4th 1004, 1009–10 (8th Cir. 2025) (officer did not violate Fourth Amendment by shooting suspect who refused to comply with commands and raised a gun "outward from his body" and "advanced in the general direction of officers"); *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 622–23 (9th Cir. 2023) (plaintiff failed to state an excessive force claim under the Fourth Amendment when officer shot suspect waving a toy that resembled a gun), *cert. denied*, 144 S. Ct. 559 (2024).

\*

Judge Dennis's concurring opinion warrants three brief responses.

First, the concurrence appears to think that *Officer Granado* must point to some authority to justify shooting Ramirez. *See ante*, at 15 (Dennis, J., concurring) (arguing my string citation includes "distinguishable" cases). This is wrong coming and going. It is *the majority, the concurrence, and Ramirez's job* to point to a case that squarely governs this one. It is not mine, and it is certainly not Officer Granado's. The absence of an on-point case means that qualified immunity applies—not that the majority is free to do justice as it sees fit. *See Laviage v. Fite*, 47 F.4th 402, 408 (5th Cir. 2022)

No. 24-10755

("[Q]ualified immunity shields officers unless existing precedent squarely governs the specific facts at issue, such that the question has been placed beyond debate." (quotations omitted)). I offered a string cite only to illustrate just how wildly off base the majority opinion is, and to show that courts routinely grant qualified immunity in circumstances that are far less dangerous than those presented here. And even if it was my job to cite a case, which it is not, I cited *two* that are materially indistinguishable—and the concurrence all but ignores them.[*]

Second, having reimagined the law, the concurrence then reimagines the relevant facts. Start with the concurrence's focus on Officer Granado's written statement. *Ante*, at 12–13 (Dennis, J., concurring). The concurrence claims the record undermines Officer Granado's statement because "the dispatch and radio transcripts" contain no proof "*Officer Watson*" told him Ramirez's vehicle "had been involved in drive-by

---

[*] *See Wilson v. City of Bastrop*, 26 F.4th 709 (5th Cir. 2022), and *Argueta v. Jaradi*, 86 F.4th 1084 (5th Cir. 2023), *cert. denied*, 145 S. Ct. 435 (2024). In *Wilson*, an officer responded to a report that a vehicle's occupants were involved in an armed confrontation. 26 F.4th at 711. One passenger emerged from the vehicle holding a gun. *Ibid.* The passenger fled, maintaining his grip on his weapon the whole time. *Ibid.* The officers gave chase and eventually shot and killed him. *Id.* at 712. We concluded that the use of deadly force was justified. *Id.* at 713–16. Whether the passenger "point[ed] a gun" at the pursuing officer's car was "immaterial to the constitutional issue." 26 F.4th at 714.

*Argueta* is similar. Officers conducted a traffic stop on Argueta's car. 86 F.4th at 1087. Argueta exited the car and "ran toward a vacant lot across the street," pressing his "right arm and hand" against his body. *Ibid.* The officer couldn't see if Argueta had a gun, but he feared that he "could not, if necessary, react with his handgun in time to stop an attack" if Argueta turned around. *Ibid.* The officer shot Argueta "five seconds after" he exited his vehicle. *Ibid.* The officer gave "no warning" before shooting him. *Id.* at 1093. But concealing his arm "amounted to a furtive gesture" sufficient to make the officer reasonably believe Argueta "posed an immediate danger," so our court granted qualified immunity. *Id.* at 1093–94. It's incomprehensible to say, as the concurrence does, that *actually holding a gun* while fleeing is somehow less of a "furtive gesture" than holding one's arm close to the body while fleeing. *Ante*, at 17 & n.3 (Dennis, J., concurring).

No. 24-10755

shootings." *Ibid.* That is an astonishingly irrelevant quibble: Even if Officer Watson didn't tell him that, LWPD dispatch certainly "informed [him] that the suspect vehicle had *previously fled from police* and that its occupants should be considered '*armed and dangerous*.'" *Ante*, at 5 n.2 (majority opinion) (emphasis added); ROA.554–55; ROA.576–77; ROA.582; ROA.931 (Officer Watson Interview) at 6:00–6:13; ROA.1013. It could not possibly matter less whether *Officer Watson* told him the occupants had been involved in drive-by shootings. All that matters is that Officer Granado learned the fact; Officer Granado testified that he learned the fact before the shooting; and there is not a single scintilla of evidence to suggest Officer Granado was lying. The concurrence's fixation on this facile "discrepancy" is bewildering.

Other assertions in the concurrence are flatly untrue. I have never "implicitly accept[ed] as true" Officer Granado's claim that Ramirez was "swinging his pistol" at Officers Granado and Watson. *Ante*, at 13 (Dennis, J., concurring) (quotation omitted). Nor did I misconstrue the summary-judgment standard by "omit[ting]" that Ramirez was a passenger in the vehicle or that a "gas station," business, or "vacant lot" were located on adjoining streets. *Id.* at 14–15. These facts are completely irrelevant to me—and to the qualified immunity question. *See Argueta*, 86 F.4th at 1087–89, 93 (whether Argueta "raised the gun" at officers as he fled toward "a vacant lot" was "immaterial"); *Wilson*, 26 F.4th at 715–16 (officers lawfully used deadly force when they shot passenger who fled with a weapon).

Third and finally, I do have one compliment for the concurrence: It says the quiet part out loud. The concurrence says that this case turns on "what an officer actually *knew*." *Ante*, at 19 (Dennis, J., concurring). Again: wrong. "[G]enuine conflicts about what an officer actually *knew* and what the suspect actually *did* in the seconds before the fatal shots" are *irrelevant* if no clearly established law forbids the officer's conduct under either version of the facts. *Ibid.* And the majority and concurrence point to

No. 24-10755

zero cases that would justify denying qualified immunity under these "disputed" facts—other than citing the "general principle that deadly force requires a sufficient threat." *Mullenix v. Luna*, 577 U.S. 7, 14 (2015) (per curiam); *see ante*, at 10 (majority opinion) ("[I]t has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." (quotation omitted)).

We've made this mistake before. Our court has previously denied qualified immunity by second-guessing whether the facts an officer "actually kn[e]w" created a "sufficient threat of harm to the officer or others" to justify deadly force. *See Luna v. Mullenix*, 773 F.3d 712, 720–25 (5th Cir. 2014), *rev'd summarily*, 577 U.S. 7 (2015) (per curiam). That inversion of the qualified immunity standard warranted summary reversal then. And I respectfully submit it also does now.

\*

For the police officers in our circuit who confront armed-and-dangerous felons fleeing drive-by shootings, who have mere seconds to make split-second life-and-death decisions in the middle of the night, and who hope to get home safely to their families and then *also* survive this court's frame-by-frame NFL-style instant replay review: Today's decision will make your already-hard jobs much harder.

I respectfully dissent.